## Case No. 1,786.

BRADLEY et al. v. RICHARDSON et al.

[2 Blatchf. 343;[1] 23 Vt. 720.]

Circuit Court, D. Vermont. Nov. 27, 1851.

CORPORATIONS —ACTIONS — INJUNCTION — RIGHTS ENFORCED AND WRONGS PREVENTED — RELIEF AGAINST JUDGMENT — GROUNDS — ASSUMPSIT — MONEY HAD AND RECEIVED — CORPORATIONS — OFFICER AND AGENTS—CONTRACTS — FACTORS— LIABILITY TO PRINCIPAL—LIABILITY OF PRINCIPAL FOR ADVANCES.

1. Where corporate rights and interests are affected in any way wrongfully and injuriously, those rights and interests, generally speaking, must be asserted and defended, both at law and in equity, in the corporate name.

[Cited in Newby v. Oregon Cent. Ry. Co., Cases Nos. 10,144, 10,145.]

2. It is not sufficient for a debtor, or for those who are entitled to assert his rights, in order to induce a court of equity to relieve against a judgment at law, to show that the debtor was wrongfully deprived of an opportunity of making a defence in the suit at law, unless a defence, apparently, would have been available. To entitle them to an interposition of a court of equity in their behalf it must appear that the judgment is unjust and inequitable, and ought not to be enforced.

3. Where property of a debtor, which is subject to an attachment in a suit pending at law. is sold to one to hold in trust for certain creditors of the debtor, and a judgment is rendered in the suit at law, and the creditors for whose benefit the purchase was made institute proceedings in equity to be relieved against the judgment so obtained, alleging that it was unduly obtained and for too large an amount, the court will not inquire merely whether the judgment was just and equitable as between the parties to it, but whether it includes claims or demands not covered by the action, or not due and payable at the commencement of the action, or which, by a proper application of payments or credits, will appear to have been paid and satisfied, and were, therefore, not existing legal claims; and, unless the judgment appears to be wrong in some of these particulars, and consequently to have been rendered for more than the property ought to have been charged with, the plaintiffs will have no ground of complaint, whatever may have been the manner in which the judgment was obtained.

4. R. B. & Co., a copartnership, acted, by mutual agreement, as the selling agents of the Burlington Mills Co., a manufacturing corporation. The copartnership of R. B. & Co. was dissolved, and a new firm constituted, under the same style and consisting in part of the same members. The new firm assumed and continued the business of the old firm, acting as the selling agents of the corporation under the same agreement which existed with the old firm. The corporation, by its treasurer, requested the new firm to pay and adjust the balance due from the corporation to the old firm and charge it, in their account, to the corporation. They did adjust it accordingly, and the old firm credited the corporation with the amount of the balance, as received of the new firm, and rendered their account to the corporation balanced by the credit in full: Held, that it must be inferred that this balance was discharged by the payment of money or what was equivalent thereto; that the corporation thereby became debtors to the new firm for the amount; and that it might be recovered by them, in an action for money had and received or for money paid and advanced.

---

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

5. The treasurer, not being merely the keeper of the money of the corporation, but empowered by the directors to borrow money in the name and for the use of the corporation, and having a general authority given him by the by-laws to pay the debts of the corporation: *Held*, that he had sufficient authority to give the assent of the corporation to the transaction by which the balance due to the old firm was thus paid.

6. Held, also, that it could not be objected against the validity of the transaction that the treasurer was a member both of the old and the new firm, that fact being fully known to the corporation.

7. An account having been rendered to the corporation, stating the balance, the payment of it and by whom it was paid, and no objection having been made at the time or afterwards, until a suit was commenced against the corporation by the new firm to recover the amount due to them: Held, that the transaction must be deemed to have been acquiesced in by the corporation.

8. The undertaking of a factor is merely to answer for the solvency of the buyer of the goods, or rather to guaranty to the principal the payment of the debt due from the buyer. He becomes liable to pay to the principal the amount of the purchase-money, if the buyer fails to pay it when it becomes due. And his undertaking is not collateral, within the statute of frauds, but is an original and absolute agreement that the price for which the goods are sold, or the debt created by the sale of the goods, shall be paid to the principal when the credit given on the sale shall have expired.

9. If the factor has agreed that he will advance to a certain amount upon the goods consigned to him, to that extent his advances may be treated as payment in advance of so much towards the goods, and, so far, the one may be set off against the other. But all moneys advanced on account beyond the amount agreed to be advanced upon the goods will constitute a present legal debt, for which he will have a present legal right of action.

10. If the principal procures and has the benefit of the advances, he is thereby precluded from objecting to them as not answering the agreement, whatever may be the form in which they are made.

11. If the factor commences a suit at law against the principal, to recover the unpaid balance due to him for his actual advances, having previously made sales of goods upon a credit not yet expired, and being at the same time liable upon acceptances and bills for the principal not yet matured, he is entitled to have the avails of the sales, as they become due, applied in satisfaction of the additional advances which he is compelled to make upon such bills and acceptances as they become due, and cannot be required to apply such avails in satisfaction of his present legal claims existing at the commencement of his suit.

In equity. This was a motion for an injunction, predicated upon a bill filed by [Harry] Bradley and others against [Andrew J.] Richardson and others, to stay execution of two judgments amounting together to the sum of $51,992.04, recovered by Richardson and others, at the October term of this court in 1851, against the Burlington Mill Company, a corporation established under an act of the legislature of Vermont, for the manufacture and sale of woollen goods. [Denied.]

William W. Peck and D. A. Smalley, for plaintiffs.

Lucius B. Peck, for defendants.

PRENTISS, District Judge. I have taken time to read the bill and papers filed in this case, which are uncommonly voluminous and contain a great variety of statements and facts, because I thought it unfit and was unwilling, whatever might be the inclination of my mind at the hearing, to decide a matter of so much importance to the parties, without first examining carefully every paper connected with it, as well as the authorities referred to by the counsel on the argument.

The bill may be considered in a threefold aspect; as presenting a right in the plaintiffs to relief, first, as stockholders in the Burlington Mill Company; secondly, as creditors of the mill company; and, thirdly, as cestui que trusts under the purchase of the property attached in the suits at law, made by Hill as their trustee, subsequent and subject to the attachments, he having deceased, and there being no personal representative competent to sue here in his right.

As stockholders simply, there would be much difficulty, on the statements made in the bill, in the plaintiffs' maintaining it. As such, they are not personally or individually responsible for the judgments recovered against the mill company; nor have they, in that character, any interest whatever in the property which was attached and is liable to be taken to satisfy the judgments. Where the corporate rights and interests are affected in any way wrongfully and injuriously, those rights and interests, generally speaking, and unless some special ground be shown, must be asserted and defended, both at law and in equity, in the corporate name. Now, the bill does not state any fraud or collusion with the judgment creditors, on the part of the mill company; but, on the contrary, it alleges that the judgments were obtained without the consent and against the will of the company and were a fraud upon the company. In this aspect of the case, it would seem that the company, in its corporate name, would be the proper party to seek relief against the judgments.

On the general ground of being creditors of the mill company, without some special interest, it would be equally difficult for the plaintiffs to maintain their claim to relief. What right has one creditor to interfere in a suit, or, indeed, in any transaction, between his debtor and another creditor, unless he has some specific interest in property which is to be affected thereby? In the case of a fraudulent judgment, creating a lien on property, or a fraudulent conveyance of property, the party seeking relief against either must show an interest in the particular property, by levy of execution, purchase or otherwise. But, whatever rights the plaintiffs may be supposed to possess as stockholders or creditors, it is not sufficient for them, nor would it be for the mill com-

pany, to show that the latter was wrongfully deprived of an opportunity of making defence in the suits at law, unless, apparently, a defence would have been available. To entitle them to the interposition of a court of equity in their behalf, it must appear that the judgments are unjust and inequitable and ought not to be enforced. If the proceedings of the stockholders and directors at Boston, dismissing the attorneys from the suits and consenting to judgments being rendered, were irregular and invalid, as is alleged, on account of the meetings being held out of this state, the attorneys, instead of withdrawing from the suits and suffering judgments to pass sub silentio, should have objected to the proceedings at the time, and submitted the question as to their validity and binding force to the consideration and decision of the court. But the judgments, it is to be observed, were not obtained, certainly not altogether so, without a hearing and without a defence. A hearing had been had upon the merits before a tribunal whose opinion, considering how the tribunal was constituted, ought to command at least as much respect, to say no more, as that of a jury. The actions, by agreement of the parties and order of court, had been submitted to the determination of referees mutually chosen by the parties. The referees had heard the parties, made an award and reported the award to the court, stating the facts and grounds upon which it was made. Exceptions were filed to the report, raising certain questions of law on the facts stated; but no exception was taken or is now taken, on account of partiality or misbehavior in the referees. It was, therefore, only the questions or points of law thus raised, that could be heard or re-examined by the court. Beyond these questions, no hearing was to be had, nor is it now urged that any could or should have been had. All else was settled; for, of the facts the referees were the exclusive judges. If the referees decided these questions rightly, and committed no mistake in point of law, the judgments are right, and there surely can be no reason in equity why the plaintiffs, in their general character of stockholders and creditors, and upon that general ground alone, should be allowed to disturb the judgments. In the case of Nason v. Smalley, 8 Vt. 118, the object of which was to enjoin a judgment at law alleged to have been fraudulently obtained, Phelps, J., said: "Although the judgment may have been obtained in such a manner that it ought not, in itself considered, to bind the complainants, yet it would be idle to interfere, if the debt thus in fact established be just and equitable, or if the party must be left at liberty to prosecute anew, and a court of law would be compelled hereafter to render a like judgment." This is good sense and sound doctrine, well expressed, and nothing can be added either to its force or significancy.

But, it is in the third aspect of the case, if in any—as cestui que trusts under the purchase made by Hill of the property attached, and as interested in the purchase as creditors, in the manner stated in the bill —that the plaintiffs are entitled to come into a court of equity and ask relief against the judgments. This relief they will be entitled to, if the case calls for relief, whether the judgments were rendered with or without the consent of the mill company; and, in this view, so far at least as concerns the question of title to relief, the manner in which the judgments were obtained, further than there being in fact no hearing in court, or the validity or invalidity of the proceedings of the stockholders and directors in Boston in relation thereto, is unimportant. I may observe, however, that whatever fraud is charged upon the directors, either in act or in motive, on account of those proceedings, is positively and fully denied by their affidavits, leaving no ground, if any existed before such denial, for the imputation to them of intentional wrong.

The bill states that the purchase by Hill was made subject to the attachments, and in trust for the plaintiffs and others, creditors of the mill company, which is alleged to be insolvent, in order to secure or satisfy them as far as might be, for notes, called three-fifths notes, executed by them to raise money for the use of the company. It is stated that the cestui que trusts were to share in the purchase in proportion to the amount of notes so by them respectively executed; that the whole amount of notes executed was about $120,000; and that the amount executed by the plaintiffs was about $23,000, giving them, therefore, an interest in the purchase equal to about one-fifth part. It appears that most of the other cestui que trusts have given their assent to the judgments, and are willing that they should be satisfied out of the property. Under such circumstances, the other cestui que trusts being content, it would seem that the claim of the plaintiffs to relief, if they have any claim, would be limited, and the measure and mode of relief adjusted and regulated by the amount of injury, if any, wrongfully resulting from the judgments to their particular personal interest in the property. As the purchase by Hill comprehended the whole property attached and the whole interest in it, except what was a legal subsisting charge upon it by virtue of the attachments, the inquiry is, not merely whether the judgments are just and equitable as between the parties to them, but whether they include claims or demands not covered by the actions, not due and payable at the commencement of the actions, or which, by a proper application of payments or credits, will appear to have been paid and satisfied, and were, therefore, not existing legal claims. This opens an examination into the merits of the judgments; and, unless they

shall appear to be wrong in some of these particulars, and consequently are for more than the property ought to be charged with, the plaintiffs have no ground of complaint, whatever may have been the manner in which the judgments were obtained.

The actions were commenced the 21st and the attachments made the 22d of May, 1849; and the purchase by Hill, in trust for the plaintiffs and others, was made June 13th, 1850. The actions contained counts on several promissory notes, and counts for money had and received, money laid out and expended and money lent and advanced. The actions, as we have already seen, and, I may add, nothing but the actions, by mutual consent of the parties and order of court, were, in proper and regular form, submitted to a reference; and, upon the report made by the referees, stating specially the grounds of their award, or rather the claims and facts in the case, the judgments complained of were rendered. The report is set forth at length in the plaintiffs' bill, and the statement of facts in it is neither denied, impugned nor questioned. Being made a part of the bill, for the purpose of presenting the merits of the controversy between the parties in the suits at law, and being treated by the bill as the basis upon which the objections to the judgments rest, we must look into the report to see whether the judgments subject the property attached to a greater charge than it was legally and properly liable to under the attachments. The bill, aside from what is alleged as to the manner of obtaining the judgments, which seems not to be essential to the purpose of the bill, beyond showing that they were rendered without any actual hearing or consideration by the court, puts the case upon this ground, narrowing down the merits to the particular questions arising from the report.

The questions raised as to the binding effect of the promissory notes upon the mill company, on account of the form in which they were executed and the purpose for which two of them were made, it is unnecessary to consider; because, all the claims that were allowed, if allowable at all, were admissible under the general counts in the actions.

It appears from the report, that the dealings between the judgment creditors and the mill company originated in an arrangement under which the former were to receive and sell, on an allowance of commissions and other charges, the manufactured goods of the latter, guaranteeing the sales of the goods and advancing thereon, in cash and acceptances and notes, as used in the course of dealing, to the amount of three-fourths of their value. It also appears that the agreement on the part of the judgment creditors was at all times fully performed; and that, at the commencement of their actions, they had paid for the avails of all the sales of goods which had matured up to that

time, and had also advanced, in cash and the payment of matured notes and acceptances, the sum of $149,062, over and above all matured sales and moneys received—the unmatured notes and acceptances being to a still much larger amount, and greatly exceeding the unmatured sales, as will be hereafter more fully seen. Such appears to have been the state of the account between the parties at the commencement of the suits, as reported by the referees. According to their finding, there was a balance then due the judgment creditors, for over-advances, of $149,062; and, such being the report, that sum must be taken to have been legally and properly recoverable by them at that time in the suits, unless it shall appear that claims were allowed which ought not to have been allowed, or payments or credits disallowed which ought to have been allowed.

We are not called upon to go into an examination of all the items in the accounts between the parties, but only of such, as we have before remarked, as raised some question of law which appears to have been presented by the report for the consideration and opinion of the court. The matters of fact, upon which the questions arise, appear to be fully and distinctly stated; and, from these and other details in the report, I am free to say, that the proceedings of the referees, after a careful and somewhat critical examination of them, appear to me, as far as I can see, to evince no other purpose than that of a just performance of duty.

It appears that items in the account of the judgment creditors, very considerable both in number and amount, being objected to, were disallowed, and that several claims set up by the mill company, though objected to, were allowed. The only items of any importance in the account of the judgment creditors which were allowed against objections made to them, except one, which deserves a distinct consideration and will be presently mentioned, were for commissions and charges on goods sold, money paid, for the salary of the mill company's treasurer, and money paid, at the request of the company, for extra interest in raising money for its use, to enable it to meet and pay its accommodation drafts. These claims, on the facts stated in the report, do not appear to have been improperly allowed; and, as to the amount which ought to have been allowed upon them, that was a matter entirely within the province of the referees, and is not the subject of re-examination, at the instance of the plaintiffs or any one else, unless upon the ground of misconduct or gross partiality. We come, then, to the item just alluded to, of $46,912, charged by the judgment creditors who compose the present firm of Richardson, Burrage & Co., for money paid by them in discharge of a balance due from the mill company to the old firm of Richardson, Burrage & Co. The two firms are dis-

tinguished in this way: The old firm consisted of three partners; the new firm consists of four, two of the old partners and two new ones. The old firm was a large stockholder in the mill company, owning, it is stated, one-third of the whole stock, and acted, during its existence, under a mutual agreement, as the selling agent of the mill company. The new firm assumed and continued the business of the old firm, acting as the selling agent of the mill company under the same agreement, in place of, and under the same name and style borne by, the old firm. The facts in relation to the item in question, as stated in the report of the referees, are these: The mill company, by its treasurer, requested the new firm, in other words, the judgment creditors, to pay and adjust the balance due the old firm and charge it, in their account, to the mill company. They did adjust it accordingly, and the old firm credited the mill company with the amount of the balance as received of the judgment creditors, and rendered their account to the mill company balanced by the credit in full.

On the facts thus stated, the transaction had the assent of all the three parties, and by it the mill company was discharged from its liability to the old firm, so that the latter had no longer any right of action against it; and, can there be any doubt that the mill company became a debtor to the judgment creditors for the amount, or that the amount might be recovered by them in an action for money had and received or money paid and advanced? If the transaction were to be considered rather as a transfer or assignment of the demand than as extinguishing the old debt and creating a new one, and the consideration paid had been something other than money, it would seem to bring the question as to the form of action, the demand being for money advanced, within the principle adopted in Wilson v. Coupland, 5 Barn. & A. 22S, recognized and confirmed in Wharton v. Walker, 4 Barn. & C. 163. But, on the facts stated, it must be taken that the original debt was satisfied by actual payment and therefore extinguished; and, from the acknowledgment of payment in general terms, it must be inferred that it was discharged by the payment of money or of what was equivalent thereto.

It is said that the treasurer had no authority to give the assent of the mill company to any such transaction, or to bind it in any such way. But the treasurer was not merely and simply the keeper of the moneys of the company, according to the ordinary definition of such an office. He was its fiscal agent for other purposes. He was empowered by the directors to borrow money in the name and for the use of the company; and was not the transaction in question, in substance and effect, if not in form, a borrowing of money for the use of the company? Besides, in addition to other duties, such as purchasing the materials to be used in manufacturing, directing the kinds of goods to be manufactured, and receiving all moneys due from agents and others, he had a general authority, given him by the by-laws, to pay the debts of the company; and, could he not pay a debt, or enter into an arrangement for the payment of a debt, in the manner in which this was done? It appears to me that, in regard to this, no serious doubt can be entertained.

It is also said that the treasurer was a partner, and therefore interested, both in the old and the new firm. So he was, and was so known to be by the mill company, not only when it appointed him treasurer, and when it afterwards refused to accept his resignation of the office, but also when it made the firms its selling agents. With this knowledge, the company could not be allowed to object, and, if so, no one else can object, that his connection with the firms disqualified him to perform the proper functions of treasurer in this or any other matter in which they might have an interest growing out of the agency. If he had not so acted, the agency could not have been executed, but must have been discontinued, and the purpose of the contracting parties have been defeated. But, there was nothing in this particular transaction that was wrong, in itself considered, or at all prejudicial to the interests of the mill company. It was simply a transfer of indebtedness from the old to the new firm, making the latter, instead of the former, whose place and business it had succeeded to in the agency, the creditor of the company.

But, it is also to be remembered, as a fact not without its effect upon the question, that an account was rendered, stating the balance, the payment of it and by whom the payment was made. The account was rendered the 30th of September, 1848, and, no objection being made to the account as stated and balanced, the transaction may be deemed to have been acquiesced in. This is the rule of law in matters of account of a commercial nature, if not in matters of account in general; and there is no reason why it should not apply to a private corporate body engaged in trade and conducting its affairs through the instrumentality of officers and agents, as well as to individual natural persons carrying on similar business and transacting it either in person or through the agency of others. It may be added, that the equity of the claim is very apparent. The referees examined the account of the old firm, and found the balance which was paid it to have been justly due.

It is further insisted by the plaintiffs, that the judgment creditors had, previous to the commencement of their suits, sold on credit a large amount of goods consigned to them by the mill company, and that the amount of these sales, although the credit given upon them had not then expired, should have been

allowed in payment or satisfaction of the claims composing the balance found then due. It appears that sales had been so made to the amount of $148,695; that the sales matured at different times from the 19th of July, 1849, to the 18th of January, 1850; and that the sales were credited in account, stating the times when due. It also appears that the judgment creditors had, previous to the commencement of their suits, given notes and accepted drafts for the mill company, to the amount of $198,824, payable at different times from the 23d of May to the 11th of October, 1849, and that the notes and drafts, although not matured, were charged in account, mentioning, as in the case of the sales, the times of their maturity. It is evident that this mode of keeping the accounts, on the one hand crediting sales before matured, and on the other charging notes and acceptances before due and payable, or before paid, was merely for the sake of convenience and accuracy, and to present the transactions as they occurred, in an intelligible form, and could not accelerate or in any way alter the legal liability of either party.

The judgment creditors were factors, selling goods for the mill company on commission; and it becomes a material question, whether a factor, in the case of a sale by him of goods on credit, is, as the plaintiffs contend, instantly or immediately liable to the principal for the amount of the sales; or in other words, whether the principal has any legal right of action against the factor until the credit has expired. Whatever doubt may have once existed on the subject, I think the question is now settled, by judicial decisions and the opinions of eminent commentators on the law, both in England and in this country. It is established, that the undertaking of the factor is merely to answer for the solvency of the buyers of the goods, or, rather, to guaranty to the principal the payment of the debts due from the buyers. He becomes liable to pay to the principal the amount of the purchase-money, if the buyers fail to pay it when it becomes due. This is the effect and whole extent of his engagement. The doctrine is so laid down in all the adjudged cases, with few exceptions, and is recognized as the true doctrine by Chancellor Kent in his Commentaries, and by Judge Story in his treatise on Agency. And I think it necessarily must be so, if the factor has authority to sell on credit, as he indisputably has, and if the principal may maintain an action against the buyers of the goods, which has been often adjudged and is nowhere denied. Some confusion has arisen on this subject from the decisions on the question whether the undertaking of a factor is a contract within the statute of frauds, and so must be in writing. The better opinion is, that it need not be in writing; that, though a guarantee, it is not a collateral engagement, but an original and absolute one, that the prices for which the goods are sold, or the debts created by the sales of the goods, shall be paid to the principal when the credit given on the sales shall have expired. Thus, in a note summing up the law on the subject, in 1 Am. Lead. Cas. [2d Ed.] 659, 660, it is said, that the contract is an absolute engagement by the factor, that the debts for which the goods are sold "shall be paid at the time they are due, or, in other words, that they shall be cash in the principal's account, at the time they are due." The plaintiffs insist that the lex loci must govern the decision of this question; and, to show the law of the place where the contract was made and executed, they cite the case of Swan v. Nesmith, 7 Pick. 220. In that case, the question was, whether the undertaking of the factor was within the statute of frauds. The court held the liability to be original, and that a guarantee of that nature need not be in writing. But they expressly admitted that, when the goods are sold upon credit, the liability of the factor is not fixed until the time of payment arrives. The case, therefore, so far as it has any application to the present question, is an authority against rather than for the plaintiffs. But, if it was otherwise, it could not be allowed to prevail against the general and what I conceive to be the established rule of commercial law. In Swift v. Tyson, 16 Pet. [41 U. S.] 1, it is laid down, that the true interpretation and effect of contracts and other instruments of a commercial nature, in suits in the courts of the United States, are to be sought, not in the decisions of the local tribunals, but in the general principles and doctrines of commercial jurisprudence.

From what has been said, it follows that the judgment creditors, at the time of the commencement of their suits, were not chargeable for the sales of goods made by them before that time, but due and payable at different times afterwards, beyond the amount, at any rate, of what they were bound by their agreement to advance upon them. To that extent, the advances might be treated as payment in advance of so much towards the goods, and so far the one might be set off against the other. But all moneys advanced on account, beyond the amount agreed to be advanced upon the goods, would constitute a present legal debt, for which there would be a present legal right of action. We have already seen the extent of the difference existing in favor of the judgment creditors at the commencement of the suits, between the amount of sales then matured and the amount of moneys then actually advanced, and also between the aggregate of unmatured sales and the aggregate of unmatured notes and acceptances. It does not appear what portion of the advances stipulated to be made was to be in ready money, and what portion in notes and acceptances on time; but, it is to be inferred from the report, that the ad-

vances were made, both in point of form and time, according to the calls of the mill company, and in such manner as suited its wants and wishes. If the company procured and had the benefit of the advances, it is thereby precluded from objecting to them as not answering the agreement, whatever may have been the form in which they were made. Considering the unmatured notes and acceptances, therefore, as satisfying the agreement as to advances upon the unmatured sales, the judgment creditors had, at the commencement of their suits, arising from over-advances, an actual unpaid and unsatisfied balance due them from the mill company of $149,062, which they then had a legal right to sue for and secure by attachment of the property of the company. Indeed, upon any adjustment, or any appropriation of the advances to the sales, not directly at variance with the agreement and the practical construction put upon it by the acts of the parties, the balance at that time would greatly exceed what was ultimately recovered in the suits.

But, it is said that, when the sales in question matured, if not before, especially when the money was received upon them, they operated as payment of so much of the claim for which the suits were brought, and should be so treated. Whether this be so or not will be readily seen by recurring to the facts. The money on these sales became due at different times from the 19th of July, 1849, to the 18th of January, 1850. On the credit of these sales, the judgment creditors had, previous to the commencement of their suits, given notes and accepted drafts for the mill company, not only amounting to a sum much larger than the amount of the sales, but payable at different times from the 23d of May to the 11th of October, 1849, much earlier than the money on the sales would become due. For these notes and acceptances, the judgment creditors had a lien on the goods and, of course, on their proceeds. Was it not, therefore, legal, as well as just and equitable, that the money arising from the sales should be applied, as it became due, in satisfaction of the advances the judgment creditors were obliged to make in payment of the notes and acceptances as they fell due? The application was so made; and I have no doubt that it was in accordance both with the usage in such cases and with law. The referees, it appears, allowed all payments made by the mill company, arising from sales or otherwise, down to February 15th, 1851, when the accounts between the parties closed, deducting from the sales, advances, commissions, and other proper charges upon them; and it was by the allowance of such payments, and the withdrawal by the judgment creditors of their claim for three-fifths notes, that the balance due them at the commencement of their suits was reduced down to the sum recovered by the judgments. In this way, the balance

of the subsequent account between the parties was ascertained and allowed, not to the prejudice but to the benefit of the plaintiffs.

I have thus noticed, in a summary way, all the material facts and points connected with the merits of the case; and, upon consideration of the whole, I am of opinion, that the plaintiffs have no claim in equity to have the property relieved, either wholly or partially, from the lien created by the attachments, or from the enforcement of the lien by execution of the judgments, and, consequently, that the injunction moved for ought not be granted. Motion denied.